# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
E.C. London & Associates, Inc. ) ASBCA No. 60273
)
Under Contract No. FA2816-05-D-0001 )

APPEARANCE FOR THE APPELLANT: Theodore P. Watson, Esq.
Watson & Associates, LLC
Aurora, CO

APPEARANCES FOR THE GOVERNMENT: Jeffrey P. Hildebrant, Esq.
Air Force Deputy Chief Trial Attorney
Lawrence M. Anderson, Esq.
Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE YOUNGER

In this deemed denied appeal, appellant E.C. London & Associates, Inc. (London or appellant) seeks payment for alleged extra-contractual work on a contract for window cleaning and base custodial services. Both parties have elected to submit their cases on the record under our Rule 11. Both entitlement and quantum are before us. We sustain the appeal in part and deny it in part.

## FINDINGS OF FACT

### A. *The Contract*

1. By date of 28 December 2004, the Air Force awarded appellant Contract No. FA2816-05-D-0001 (the contract) to appellant for window cleaning and general base custodial services at the Los Angeles Air Force Base (R4, tab 1; Joint Stipulation of Facts (J.S. ¶ 16)). The contract was a firm-fixed-price, indefinite-quantity contract, which included one base period (January 2005 to September 2005), and four option periods, each one year in length (J.S. ¶ 18). The Air Force subsequently exercised all four option periods, and the last one continued through September 2009 (J.S. ¶¶ 18-19, 53-54).

2. The contract incorporated numerous standard clauses by reference, including FAR 52.232-25, PROMPT PAYMENT (FEB 2002); FAR 52.233-1, DISPUTES (JUL 2002); and FAR 52.243-1, CHANGES–FIXED-PRICE (AUG 1987), ALTERNATE II (APR 1984) (R4, tab 1 at 58).

3. The contract contemplated that the square footage of window surfaces to be cleaned might vary when older buildings were torn down and replacement buildings constructed. Thus, the contract's Schedule contained Section B.4, Estimated Window

Cleaning and Base Carpet and Rug Cleaning and Shampooing Square Footage. Section B.4 listed the contract line item numbers (CLINs) in the contract by base period and option periods, by period of performance for each, and by average semi-annual square footage. It provided in part:

> The square footage indicated in CLINs 0004 [Base Exterior Window Cleaning Services] and 0005, and respective options CLINs if exercised, is an estimated number of square feet based on cleaning all windows...in the buildings.... The average semi-annual square footage takes into account that old facilities and new facilities are of different size. Therefore, the actual quantity of square feet to be ordered for cleaning in any 6-month period may be higher or lower than the average semi-annual square footage. Task order will indicate how many square feet are ordered for cleaning each semi-annual period.

(R4, tab 1 at 3-4)

4. The contract divided the window cleaning services into those to be performed on the interior of designated buildings, and those to be performed on the exterior (J.S. ¶¶ 21, 23).

5. By Amendment No. 03 dated 30 September 2006, the Air Force added three buildings, designated as Buildings 270, 271 and 272 to the contract (R4, tab 2 at 1-2; J.S. ¶ 40). No contract amendment or modification addressed the glass square footage of Buildings 270, 271, or 272 (J.S. ¶ 41).

B. *Interior Window Cleaning*

6. The contract contained a Performance Work Statement. In paragraph 2.3.2, Clean Interior Windows, it provided: "Clean glass surfaces that are over seven (7) feet high. After surfaces have been cleaned, all traces of film, dirt, smudges, water and other foreign matter shall be removed from frames, casings, sills, and glass." (R4, tab 4 at 8, tab 37 at 8)

7. CLIN 0003 "Base Custodial Services – [Los Angeles Air Force Base] and Ft Mac" provided that "[t]he Contractor shall accomplish the work set forth in the Performance Work Statement for Base Custodial Services, except [certain paragraphs] for all buildings located at LAAFB and Fort Mac Arthur, except the Medical Clinics in Buildings 30 and 210" (J.S. ¶ 22).

8. Paragraphs 2.1.9 and 2.1.10 of the Performance Work Statement contained provisions regarding general cleaning and dusting, as follows:

2

**2.1.9. General Cleaning (Doors and Walls).**
Perform cleaning on doors and walls (**including stairwells**) up to seven (7) feet on a daily basis. General cleaning includes, but is not limited to removing, or cleaning smudges, fingerprints, marks, streaks, spills, etc., from washable surfaces of all walls, doors, door guards, door handles, push bars, kick plates, light switches, temperature controls, and fixtures. After general cleaning, the surface shall have a clean, uniform appearance, free of streaks, spots, and other evidence of soil.

**2.1.10. Dusting.**
The Contractor shall dust all horizontal surfaces to include but not limited to pipes, ledges, railings, window sills, window coverings, light fixtures, TV's and TV apparatus,' air ducting, ceiling fans, and vents so that after dusting they are free of all visible dust, lint, litter and dry spoil, at a frequency of not less than once a week. Dusting consists of Low Dusting (<7') which shall be done not less than weekly, and High Dusting (>7' but <15') which shall be not less than monthly.

(R4, tab 41 at 7-8)

*C. Exterior Window Cleaning*

9. Performance Work Statement paragraph 2.3.3, Clean Exterior Windows, provided: "Windows are the glass surfaces that are an integral part of the outer wall of the building" (R4, tab 4 at 8).

10. The relevant CLIN for exterior window cleaning is CLIN 0004 Base Exterior Window Cleaning Services and its corresponding option year CLIN, *viz.*, CLINs 0104, 0204, 0304, and 0404 (R4, tab 1 at 9, 16, 23, 30, 37; J.S. ¶ 25).

11. CLIN 0004 and its corresponding option year CLINs required appellant to perform exterior window cleaning services "semi-annually at six-month intervals as set forth in task orders" (R4, tab 1 at 9, 16, 23, 30, 37; J.S. ¶ 26). It is undisputed that London was to be paid $0.312 per square foot for CLINs 0004, 0104, 0204, 0304, and 0404 (J.S. ¶ 27).

12 In paragraph B.3, Estimated Average Monthly Square Footage, the contract contained an average monthly square footage estimate of cleaning for CLIN 0004 of

3

79,725 SF, and 87,450 SF each for the corresponding option year CLINs 0104, 0204, 0304 and 0404 (R4, tab 1 at 3-4).

D. *Performance and Claim*

13. One area where the contract was to be performed was designated by the parties as Area A. It originally included seven buildings denominated as Buildings 100, 105, 110, 115, 120, 125, and 126. The original Area A buildings were torn down during performance and replaced by three new buildings, designated as Buildings 270, 271, and 272. (J.S. ¶¶ 33-34)

14. By memorandum dated 17 January 2006, SSgt William Rupert, the Noncommissioned Officer in Charge for Work Order Projects, advised the office of the contract specialist that "[t]he estimated square footage of surface area [for the windows at Building 272] is 86,112" (R4, tab 49).

15. By date of 23 March 2006, in response to an inquiry from London, SSgt Rupert advised an Air Force contract specialist that the interior and exterior window square footage for the three newer buildings was as follows:

(a) Building 270: 96,445 square feet;
(b) Building 271: 94,723 square feet;
(c) Building 272: 86,112 square feet.

Thus computed, the total for all three buildings aggregates 277,280 square feet. (R4, tab 13 at 11; J.S. ¶ 37) SSgt Rupert noted that the contract "needs to be [modified] to reflect new numbers because the CLIN only covers exterior side of the windows" (R4, tab 13 at 11).

16. We find nothing in the record explaining how SSgt Rupert arrived at his figures. The record contains no affidavit or declaration from SSgt Rupert himself explaining his methodology, and his calculations cannot be explained or verified by reference to other documents in the record.

17. Neither party is aware of any other window square footage measurements that were made, nor of any other window square footage estimates made, during contract performance, regarding Buildings 270, 271, or 272 (J.S. ¶ 38).

18. By email to appellant dated 23 March 2006, a contract specialist for the Air Force advised London that she had asked SSgt Rupert "to put together a formal modification package to revise the window cleaning portion of the contract that will include, drawings, measurements, etc. Once received, I'll pass the revision on to you." (R4, tab 13 at 10)

4

19. The parties met regarding outstanding issues on 5 January 2007. Among the issues they addressed were that the contract "provides the total square footage for exterior window cleaning, but does not detail square footage by building or area." The Air Force undertook that a member of the Engineering and Logistics Squadron on base "will provide the Square Footage for exterior window cleaning by **Friday, 12 January 2007.**" (R4, tab 50 at 1) The Air Force made the same undertaking following a meeting on 20 February 2007 (R4, tab 51).

20. By date of 17 September 2007, the Air Force revised the Performance Work Statement for the contract (R4, tab 4). With respect to interior window surfaces, section 2.3.2 of the revised Performance Work statement retained the same requirement as the original, *viz.*, "Clean glass surfaces that are over seven (7) feet high" (J.S. ¶ 52).

E. *Claim and Appeal*

21. By date of 16 August 2010, appellant submitted its certified claim to the contracting officer, seeking a total amount of $374,323.75, consisting of $370,970.49 in alleged extra costs for window cleaning services performed, and for an alleged $3,353.26 for three unpaid invoices (J.S. ¶¶ 1-3). With respect to the portion of the claim pertaining to unpaid invoices, we find no evidence in the record that London has also submitted a claim for interest under the Prompt Payment Act, 31 U.S.C. §§ 3901-3907.

22. The contracting officer did not render a decision on the claim (J.S. ¶ 12). By letter dated 7 October 2015, appellant filed its notice of appeal to the Board from the deemed denial of its claim.

23. In 2016, after the filing of the appeal, the Air Force has tendered the declaration of Dennis A. Hass, the contracting officer in 2016 (R4, tab 48 at 1). His conclusion is that "London was paid for the actual square footage reflected in the Task Orders" (*id.*). He explained that the contract "indicates the contractor will be provided the square footage to be cleaned by issuance of Task Orders." He added, that for exterior window cleaning:

> The Task Orders reflected 159,450 square feet for Exterior
> Windows CLIN 0004 for the Base Period. All Option Periods
> reflected an increase to 174,900 square feet. The contractor
> was paid for that square footage minus the 3 shorted invoices
> [aggregating $3,353.26] that the Government acknowledges
> is due the contractor [*see* finding 29].

(*Id.*)

24. In his declaration, Mr. Hass states that he requested the Engineering and Logistics Squadron on base:

> [T]o calculate/measure the square footage of the outside windows for the torn down buildings (100, 105, 110, 115, 120, 125, 130) using the blueprints and/or Computer Assisted Drawings (CAD) for these torn down buildings. Using blue prints/CAD, the Civil Engineers calculated the square footage of these [torn down] buildings...to be **58,935** square feet on or about 3 Feb 2016.

Mr. Hass also stated that he:

> [A]sked the Civil Engineers to do the same for the three new four story buildings (270, 271 and 272).... They found the CAD drawings/they manually measured the outside window square footage and it amounted to **71,502** square feet on or about 3 Feb 2016. This resulted in an overall increase of 12,567 square feet from Area A buildings to replacement buildings in Area B.

(*Id.*)

25. Mr. Hass disagreed with the square footage estimate relied upon by London in its complaint of 138,640 square feet of exterior window surfaces. He asserted that the count was made by SSgt Rupert in 2006. He regarded it as "grossly inflated and incorrect." He amplified that, if the count "reflected square footage for a one year period then it would have equated to 69,320 square feet per performance occurrence (138,640 [divided by] 2 = 69,320; therefore making the measurement less than what the current engineers have provided me." (R4, tab 48 at 3)

26. With respect to the square footage of the interior window surfaces, Mr. Hass opined that the interior window surfaces were covered by CLIN 0003 (*see* finding 7), which was unaffected by the revision "and therefore would be priced under CLIN 0003" (R4, tab 48 at 3).

27. London completed all performance of the contract upon the expiration of the Option Period 4 on 30 September 2009.

F. *Unpaid Invoices*

28. During performance, London submitted three invoices that remain unpaid in whole or in part, as follows:

(a) Invoice No. 062809, submitted 1 July 2009 for $720.00; unpaid in full;
(b) Invoice No. 092009, submitted 28 September 2009 for $947.20, $738.86 of which remains unpaid; and
(c) Invoice No. 092109, submitted 28 September 2009 for $81,285.41, $1,894.40 of which remains unpaid.

The amounts due under these three invoices aggregate $3,353.26. (R4, tab 12 at 1-2, tab 23 at 18-19, 21-22, 23-25)

## DECISION

A. *Square Footage*

London concentrates its arguments under a single broad proposition. London contends that Amendment No. 03, adding Buildings 270, 271 and 272 to the contract, and thereby requiring exterior window cleaning (*see* finding 5) constitutes a compensable change (Appellant's Brief in Support of Claim (app. br. at 8-17)). London asserts that the "overarching issue is whether the addition [of these three buildings] resulted in an increased window square footage area for EC London to clean" (*id.* at 9). London tells us that "the new buildings were not anticipated within the Contract requirements at the time of award (*id.*).

London's major arguments include, first, that the contract only required it to clean interior windows over seven feet high (Appellant's Reply to Respondent's Rule 11 Brief (app. reply) at 2-3). Second, London contends that the contract did not reflect the interior and exterior glass surfaces of Buildings 270, 271, and 272, and hence that it is entitled to payment for the increase (*id.* at 4-5). London strongly relies upon the measurements of SSgt Rupert (*see* findings 15-16) and attacks Mr. Hass for producing "inaccurate and misleading measurements" (app. br. at 12). Third, London stresses that the Air Force breached its duty to cooperate by failing to modify the contract to reflect the actual glass surface square footage, and by failing to issue a contracting officer's decision on its claim (*see* findings 22-23).

For its part, the Air Force disputes the central premise of London's argument. The Air Force argues that, "[c]ontrary to Appellant's contention that the square footage of windows to be cleaned increased when new buildings came on line, these increases were substantially offset when old buildings whose windows Appellant was required to clean came off line" (Respondent's Reply to Appellant's Rule 11 Brief Regarding Appeal

7

No. 60273 (gov't reply at 1)). The Air Force relies chiefly upon the calculations of the Base civil engineers, as detailed in Mr. Hass's declaration (*see* findings 23-26), and concludes that London "was *overpaid* for the work it did during the base year and option year periods for each cleaning" (Respondent's Rule 11 Brief (gov't br. at 23)). In addition, with respect to interior window cleaning, the Air Force contends that London was compensated for interior windows from the floor up to the seven foot point through CLIN 0003, and hence no additional reimbursement is due (*id*. at 15).

We reject London's position for two principal reasons. First, we conclude that the preponderance of the evidence establishes that London was paid for the square footage set forth in the task orders. Under the Changes clause in the contract (*see* finding 2), London may only recover if the alleged change increased its cost of performance. *See* FAR 52.243-1(b). The contract stated that "[t]ask order[s] will indicate how many square feet are ordered for cleaning each semi-annual period" (finding 3). In his declaration, the contracting officer swears that "London was paid for the actual square footage reflected in the Task Orders" (finding 23). The record does not contain any affidavit, declaration, or document contradicting this conclusion. Hence, we can only conclude that, on this ground alone, London has not established entitlement.

Second, we conclude that we cannot place reliance on the calculations of SSgt Rupert. As we have found, the record contains no affidavit or declaration from SSgt Rupert explaining the methodology underlying his calculations, and there is no indication that they can be replicated by reference to other data (finding 16). By contrast, the contracting officer relies upon the calculations of the Base civil engineers. The contracting officer has vouched for their figures under oath, the underlying methodology, which included resort to the CAD drawings, is explained, and the figures presumably are replicable.

## B. *Unpaid Invoices*

The Air Force does not dispute London's entitlement to the amounts claimed on each of the three invoices (*see* finding 28). The invoices were part of London's Contract Disputes Act claim before us, and we conclude that London is entitled to recover the aggregate unpaid total of $3,353.26, plus Contract Disputes Act interest on that amount.

London contends, however, that it "is also due interest under the Prompt Payment Act," 31 U.S.C. §§ 3901-3907 with respect to these invoices (app. reply at 1). While the Contract Disputes Act and Prompt Payment Act interest rates may correspond, the former runs from the date London submitted its claim on 16 August 2010 (*see* finding 21), while the latter would start running a year earlier, in July – September 2009, when the three invoices were presumably received (*see* finding 28). *See* 31 U.S.C. § 3901(a)(4). In seeking Prompt Payment Act interest, London relies upon FAR 52.232-25(a)(4), providing in part that the payment office "will pay an interest penalty automatically, without request from the Contractor, if payment is not made by the due date."

8

We disagree with London that we have jurisdiction over its demand for Prompt Payment Act interest. While such interest may accrue automatically, the record does not contain evidence that London has submitted a separate claim for interest under the Prompt Payment Act (finding 21). Absent such a claim, we lack jurisdiction to award Prompt Payment Act interest. *E.g.*, *Firth Constr. Co.*, ASBCA No. 51660, 00-1 BCA ¶ 30,587 at 151,048 ("While appellant did submit a claim for unpaid contract proceeds, we have found no evidence that it submitted an independent claim for Prompt Payment Act interest.").

## CONCLUSION

Appellant is entitled to recover $3,353.26 on its unpaid invoices, together with Contract Disputes Act interest from 16 August 2010, the date of submission of its claim. In all other respects, the appeal is denied.

Dated: 1 September 2017

ALEXANDER YOUNGER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

9

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60273, Appeal of E.C. London & Associates, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals